**Kimberly BROWN, Appellant**

v.

**J. KAZ, INC. t/d/b/a Craftmatic and Craftmatic of Pittsburgh.**

No. 08–2713.

United States Court of Appeals, Third Circuit.

Argued July 8, 2009.

Filed: Sept. 11, 2009.

Rufus A. Jennings, (Argued), Timothy M. Kolman, Timothy M. Kolman & Associates, Attorneys for Appellant.

William G. Merchant, Hilary W. Taylor, (Argued), Papernick & Gefsky, Monroeville, PA, Attorneys for Appellee.

Before: SLOVITER, AMBRO, and JORDAN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Kimberly Brown appeals the District Court's grant of summary judgment in favor of appellee J. Kaz, Inc., d/b/a Craftmatic of Pittsburgh ("Craftmatic"), on her employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. §§ 951 *et seq.*

We will affirm the District Court's grant of summary judgment on Brown's claims under Title VII and the PHRA because, as the District Court concluded, Brown was an independent contractor, rather than an employee, of Craftmatic and therefore outside the protections of those statutes. In contrast, Brown's claim under section 1981 requires more extended consideration, as that claim presents us with a matter of first impression in this circuit.

## I.

Craftmatic is a distributor of adjustable beds. Craftmatic sells its products through sales representatives who visit potential customers' homes to demonstrate the beds and attempt to make sales. In the summer of 2006, Brown, an African-American female, responded to a Craftmatic advertisement seeking sales representatives and spoke twice by telephone with Jay Morris, Craftmatic's recruiting manager, regarding a job.

Morris invited Brown to attend a training session at Craftmatic's Pittsburgh, Pennsylvania, office in August 2006. During these conversations, Brown, a resident of Cleveland, Ohio, told Morris that she would take the bus to Pittsburgh because she preferred not to drive in unfamiliar places. Morris testified at his deposition that he was concerned about Brown's ability to meet the transportation requirements of the sales representative position in light of Brown's unwillingness to drive to Pittsburgh, but nonetheless invited her to training because she was well-spoken and showed enthusiasm for the position.

Brown attended a training session, which was held from August 8–10, 2006, with two other trainees, Ronald Gibbs and Daryl Rinehart, neither of whom was African-American. Brown, Gibbs and Rinehart were met at Craftmatic by Morris. Brown contends that, during that initial meeting, Morris stated that "I know she [Brown] is going to be a problem" and that "She's going to be a headache. She asks a lot of questions." App. at 324.

Craftmatic's training manager, Daniel Pesta, conducted the training session, during which the trainees were introduced to the product they would be selling and Craftmatic's business practices. As part of the training, Pesta gave the trainees an assignment to complete between the first

and second days of training and another assignment between the second and third days; the assignments required the trainees to complete standard sales contracts and similar activities. According to Pesta, Brown failed to complete both assignments. However, Craftmatic's owner, John Girty, testified at his deposition that Pesta told him that Brown completed her assignments; Brown also contends that she completed her assignments. In any event, Pesta provided Brown with a copy of Craftmatic's "Independent Contractor Agreement" at the end of the second day of training, and Brown signed the agreement on the final day of training.

Later the final training day, Brown, Gibbs and Rinehart took a break on a deck outside of Craftmatic's office. Morris approached them, extended his hand to all three, shook hands with Gibbs and Rinehart, and exchanged pleasantries with them. However, for reasons that are unclear, Brown refused to shake Morris' hand.

The details of what happened next are disputed, although it is undisputed that Brown and Morris had a heated argument. According to Brown, after she refused to shake his hand, Morris stated, "Well, you ain't nothing but a black person anyway" and "Well, you ain't nothing but the N word." App. at 329. Brown states that, after she asked, "Are you calling me a nigga," Morris "smirked and shook his head." App. at 329–30. Morris, on the other hand, testified at his deposition that he told Brown that "not shaking a man's hand is like calling a black person a derogatory name" and that "it's like calling a black person the N-word." App. at 157–58. After this exchange, as summarized by the District Court, "the two engaged in some discussion about slapping or hitting people, although it is unclear, but irrele-

vant, as to who initiated this topic of discussion." App. at 4.

Brown thereafter returned to the training room. Morris entered the room and told Brown that, if he had anything to say about it, she would not work for Craftmatic. Morris then reported the incident to Girty and told him that he did not want Brown to be a sales representative. Girty told Morris that he had used a bad choice of words. Pesta, who was not present at the incident, also met with Girty following the incident and also believed that Brown should not be permitted to act as a sales representative for Craftmatic, although it is unclear whether he so informed Girty at that meeting.

After meeting with Morris and Pesta, Girty decided that Craftmatic would not use Brown as a sales representative. Pesta informed Brown of Girty's decision and provided a check from Craftmatic to reimburse her for the expenses she incurred in attending the training session.

Brown thereafter timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission. The EEOC issued a dismissal and notice of rights to Brown on March 27, 2007, and Brown then filed the instant action alleging violations of Title VII, section 1981 and the PHRA based on theories of disparate treatment, hostile work environment, and retaliation. Following discovery, the District Court granted summary judgment to Craftmatic on all of Brown's claims.

The District Court granted summary judgment on the claims under Title VII and the PHRA because Brown was an independent contractor and therefore outside the protections of those acts. On the other hand, the District Court concluded that Brown's claims under section 1981 were not barred because of her indepen-

dent contractor status. However, the Court held that Brown could not prove that the termination of her contractual relationship with Craftmatic violated section 1981 under either the mixed-motive analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or pretext analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). According to the Court, even assuming that Brown produced direct evidence of discriminatory racial animus that was causally related to Girty's decision to terminate her employment, Craftmatic was entitled to summary judgment because it proved that the same decision would have been made regardless of Brown's race.

Specifically, the Court concluded that Girty had two concerns regarding Brown that justified her termination. First, based on the altercation with Morris, Girty was concerned that "Brown would exhibit inappropriate behavior in a customer's home." App. at 17. The Court reasoned that, "[h]ad Morris uttered no racial slurs during the argument, but reported the same incident to Girty, Girty would have been equally concerned with Brown's attitude and behavior" because sales representatives must enter customers' homes and "Girty would need to be comfortable knowing that his sales representative could remove himself or herself from the altercation swiftly and without escalating it." App. at 17–18. Second, Girty was concerned "that Brown, who admittedly does not like to drive in unfamiliar places, could not perform the job of a traveling sales representative." App. at 17.

Finally, the Court granted Craftmatic summary judgment on Brown's hostile work environment claim because Brown produced no evidence that racial discrimination was regular or pervasive at Craftmatic and on Brown's retaliation claim because she had not engaged in any protected activity before her contractual relationship with Craftmatic was terminated. Brown timely appealed.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction under 28 U.S.C. § 1291. "On an appeal from a grant or denial of summary judgment, our review is plenary and we apply the same test the district court should have utilized initially." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir.2009). "A court may grant summary judgment only when the record 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)). We must construe the evidence in favor of the non-moving party, and summary judgment must be denied if there exists enough evidence "to enable a jury to reasonably find for the nonmovant on the issue." *Id.* (citation omitted).

## III.

A. Title VII and PHRA Claims

 Brown contends that the District Court erred in concluding that she was an independent contractor of Craftmatic, rather than an employee, and therefore not protected by Title VII or the PHRA.[1]

---

1. Brown also contends that the PHRA extends to independent contractors. However, the PHRA only applies to "independent contractors who are in professions or occupations regulated by the [Pennsylvania] Bureau of Professional and Occupational Affairs or those who are included in the Fair Housing Act." *Velocity Express v. Pa. Human Relations Comm'n*, 853 A.2d 1182, 1186 (Pa. Commw.Ct.2004). Brown's position as a sales representative at Craftmatic does not fall within these categories, and therefore she was

The term "employee" is defined in Title VII as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In *Nationwide Mutual Insurance Co. v. Darden*, a case arising under the Employee Retirement Income Security Act, the Supreme Court construed an identical provision to incorporate traditional agency law principles. 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 211–12, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (citing favorably *Darden* in a Title VII case).[2]

▮▮▮ Thus, the question of whether an individual is an employee turns on "the hiring party's right to control the manner and means by which the product is accomplished." *Darden*, 503 U.S. at 323, 112 S.Ct. 1344 (quotation omitted). As the Court summarized in *Darden:*

> Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323–24, 112 S.Ct. 1344 (quotation omitted).

Brown contends that a number of these factors suggests that she was an employee of Craftmatic. However, we conclude that the District Court correctly determined that Brown was an independent contractor, not an employee. Although Brown notes that Craftmatic's standard practice was to assign appointments to its sales representatives, such representatives could also schedule their own appointments. Brown also notes that Craftmatic made recommendations to its sales representatives regarding appropriate statements to prospective customers, but Craftmatic merely barred its representatives from making false or misleading statements. Otherwise, Craftmatic provided only recommendations regarding how the sales process should proceed and not "a canned script." App. at 373. We agree with the District Court that these controls were "the minimum that a corporation needs to

---

entitled to the protections of the PHRA only if she was an employee of Craftmatic. *See id.* at 1186 nn. 7–8. We have previously held that "[c]laims under the PHRA are interpreted coextensively with Title VII claims," *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n. 6 (3d Cir.2006), and it follows that Brown is an employee of Craftmatic under the PHRA only if she is one under Title VII.

**2.** Prior to *Darden*, this court held that a "hybrid of the common law 'right to control' standard and the 'economic realities' standard" applicable in cases under the Fair Labor Standards Act governed the determination of whether an individual was an employee or independent contractor under the Age Discrimination in Employment Act and Title VII. *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 37 (3d Cir.1983). The hybrid approach is not significantly different than the approach adopted in *Darden* because it "focuses on the employer's right to control employee as the most important factor in determining employee status." *Id.* (quotation omitted); *see also Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993) (noting that both the common law and hybrid standards place their "greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished" and that even the common law standard may consider as relevant "an individual's economic dependence upon the hiring party"). Accordingly, we need not dwell on the impact of *Darden* on our decision in *Zippo*.

maintain the quality of its product and services, and consistency in its business practices," and therefore should not be sufficient to transform Brown into an employee. App. at 13.

Moreover, the *Darden* factors in their totality suggest that Brown was not an employee of Craftmatic. Brown had to provide her own equipment for sales appointments (except for a massage demonstration tool and a DVD for which she was required to pay a deposit), her own office supplies, and her own means of transportation to appointments. Craftmatic provided Brown with no office space and paid her on a commission basis only. Brown was also required to pay for her own expenses, including liability insurance, and was responsible for payment of all taxes arising from her work. Brown was permitted to negotiate price on her sales (within certain limits) and to solicit customers on her own. Finally, Craftmatic could only assign Brown sales appointments and no other work.

■ Our conclusion that Brown was not an employee of Craftmatic is reinforced by the terms of the parties' "Independent Contractor Agreement," which clearly provided that the sales representative was an independent contractor. "The agreement, while not dispositive of the plaintiff's employment status, is strong evidence that she was an independent contractor." *Holtzman v. World Book Co., Inc.*, 174 F.Supp.2d 251, 256 (E.D.Pa.2001); *see also Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1293 (9th Cir.1999).

In sum, Brown was not an employee of Craftmatic for purposes of Title VII or the

PHRA. Therefore, her termination did not fall within the protections of either statute.

**B. Section 1981 Claims**

At the threshold, we must determine whether Brown's claims pursuant to section 1981, like her claims under Title VII and the PHRA, are barred because of her status as an independent contractor. Although we have not previously decided the issue, at least three of our sister courts of appeals have held that an independent contractor may bring a discrimination claim under section 1981 against the entity with which she contracted. *See Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir.2003); *Webster v. Fulton County*, 283 F.3d 1254, 1257 (11th Cir.2002); *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 13–14 (1st Cir.1999).

■ The text of section 1981 provides that *"all persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens."* 42 U.S.C. § 1981(a) (emphasis added).[3] Thus, section 1981 "does not limit itself, or even refer, to employment contracts but embraces all contracts and therefore includes contracts by which a[n] ... independent contractor ... provides service to another." *Danco*, 178 F.3d at 14. We thus agree with the decisions that hold that an independent contractor may bring a cause of action under section 1981 for discrimination occurring within the scope of the independent contractor relationship.

Turning to the merits of Brown's section 1981 claims, we have previously held that the substantive elements of a claim under section 1981 are generally identical to the

---

**3.** Further, the phrase "make and enforce contracts" is broadly defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.

§ 1981(b). Appellant correctly notes that she is protected by § 1981 despite the fact that she had never actually begun work. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006).

elements of an employment discrimination claim under Title VII. *See Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 499 (3d Cir.1999). Here, Brown's primary claim is that Craftmatic's decision to terminate her independent contractor status resulted from a racially discriminatory motive and therefore was improper under either the *Price Waterhouse* mixed-motives analysis or the *McDonnell Douglas* pretext analysis.[4] The District Court rejected Brown's claims under both theories because, even assuming that Brown produced direct evidence of racial animus that was causally connected to her termination, Craftmatic demonstrated that it would have made the same decision regardless of her race.

4. Brown also brought claims based on hostile work environment and retaliation theories. However, we agree with the District Court that Craftmatic was entitled to summary judgment on both claims. As to her hostile work environment claim, Brown simply failed to provide any evidence of "harassment ... so severe or pervasive that it alter[ed] the conditions of [her] employment and create[d] an abusive work environment." *Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001). Similarly, as to her retaliation claim, Brown failed to adduce any evidence that she engaged in statutorily protected activity. *See Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir.2006).

5. Two events following the Supreme Court's decision in *Price Waterhouse* complicate the application of that decision to this case. First, Congress passed the Civil Rights Act of 1991 in response to, among other cases, *Price Waterhouse,* and thereby amended Title VII to set forth standards applicable to mixed-motive cases under Title VII. Specifically, the amendments to Title VII made clear that an "unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice," 42 U.S.C. § 2000e–2(m), and that an employer-defendant has a partial affirmative defense that limits the remedies available to the plaintiff if the defendant can show that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e–

We focus on the mixed-motives analysis under *Price Waterhouse.* This court has held that Justice O'Connor's concurring opinion "represents the holding of the fragmented Court" in that case. *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 n. 2 (3d Cir.2002). Accordingly, if the plaintiff shows "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," the burden shifts to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." *Price Waterhouse,* 490 U.S. at 276, 109 S.Ct. 1775 (O'Connor, J., concurring).[5]

5(g)(2)(B). However, although the Civil Rights Act of 1991 amended section 1981 in other ways, it did not make the mixed-motive amendments described above applicable to section 1981 actions. Therefore, *Price Waterhouse,* and not the 1991 amendments to Title VII, controls the instant case, and Craftmatic has a complete defense to liability if it would have made the same decision without consideration of Brown's race. *See Mabra v. United Food & Commercial Workers Local Union No. 1996,* 176 F.3d 1357, 1357–58 (11th Cir. 1999).

Second, prior to oral argument, we requested that the parties address the impact, if any, of the Supreme Court's recent decision in *Gross v. FBL Fin. Servs., Inc.,* —— U.S. ——, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), on the application of *Price Waterhouse* to claims under section 1981. In their written responses and at oral argument, the parties agreed that *Gross,* which rejected the application of the *Price Waterhouse* framework to claims under the Age Discrimination in Employment Act ("ADEA"), has no impact on this case. Accordingly, we need not decide the impact, if any, of *Gross* on section 1981 here. We note only that *Gross* focused on the statutory text of the ADEA and concluded that Congress' use of the phrase "because of ... age" meant that "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." 129 S.Ct. at 2350–51. Section 1981, howev-

Thus, Brown must first present "direct evidence of discrimination," which this court has defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the plaintiff's race] in reaching their decision to fire [her]." *Fakete*, 308 F.3d at 338. Here, the District Court assumed that Brown had presented such direct evidence based on the incident between Brown and Morris.

 Indeed, taking the evidence in the light must favorable to Brown, the record shows that after Brown refused to shake Morris' hand during their interaction on the third day of training, Morris stated, "Well, you ain't nothing but the N word," App. at 329, and responded in the affirmative when Brown asked him if he was calling her a "nigga," App. at 329–30. These were not simply "stray remarks." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Within minutes of the incident, Morris, who was the recruiting manager for Craftmatic, told Brown that if he had any say in the matter she would not be permitted to work for Craftmatic and reported the incident to Girty, Craftmatic's owner. Girty then decided, upon Morris' recommendation, to terminate Craftmatic's contractual relationship with Brown without ever speaking to Brown or to the other trainees who were present during the incident. As we have explained, "one form of evidence sufficient to shift the burden of persuasion under *Price Waterhouse* is statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, even if the statements are not made at the same time as the adverse employment decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motivated the decision." *Fakete*, 308 F.3d at 339.

Thus, Craftmatic was entitled to summary judgment only if it proved "that if [race] had not been part of the process, its [termination] decision concerning [Brown's contract] would nonetheless have been the same." *Price Waterhouse*, 490 U.S. at 279, 109 S.Ct. 1775 (O'Connor, J., concurring). Significantly, "proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made." *Id.* at 252, 109 S.Ct. 1775.

The District Court concluded that Craftmatic satisfied its burden, but several elements of the Court's reasoning are problematic. First, it noted that Girty, the ultimate decisionmaker regarding Brown's termination, decided to terminate her contract after speaking to Pesta, Craftmatic's training manager, and that Pesta, "who is alleged to have no racial animus against Brown, . . . agreed that Brown should not be permitted to act as a sales representative." App. at 18. However, in his deposition, Girty stated that Pesta did not provide him with any information that led to his decision to terminate Brown's contract. Thus, Craftmatic cannot rely on Pesta's

---

er, does not include the "because of" language used in the ADEA. Instead, section 1981 more broadly provides that "all persons . . . shall have *the same right* . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). Indeed, use of the *Price Waterhouse* framework makes sense in light of section 1981's text. If race plays any role in a challenged decision by a defendant, the plain terms of the statutory text suggest the plaintiff has made out a prima facie case that section 1981 was violated because the plaintiff has not enjoyed "the same right" as other similarly situated persons. However, if the defendant then proves that the same decision would have been made regardless of the plaintiff's race, then the plaintiff has, in effect, enjoyed "the same right" as similarly situated persons.

views regarding the advisability of retaining Brown as a sales representative as evidence that Girty would have made the same decision regardless of Brown's race.

Next, the District Court noted that Girty was concerned "that Brown, who admittedly does not like to drive in unfamiliar places, could not perform the job of a traveling sales representative." App. at 17. There are several problems with Craftmatic's reliance on this evidence as proof that Girty would have made the same decision regardless of Brown's race. Most importantly, Morris and Pesta were aware that Brown did not like to drive in unfamiliar places prior to the incident between Morris and Brown. Indeed, Morris was made aware of Brown's driving preferences during their initial phone conversation but still invited Brown to attend the training sessions. Similarly, Pesta, despite his knowledge of her driving preferences, entered into the Independent Contractor Agreement with Brown on behalf of Craftmatic. Indeed, Pesta testified at his deposition that the "fact that [Brown] came in on a bus in and of itself didn't have any bearing" on whether Brown was a good sales representative candidate and that Brown informed him that she had a car. App. at 378–79. Thus, a reasonable jury could infer that neither Morris nor Pesta would have recommended termination of Brown's contract to Girty because of her preference against driving in unfamiliar places. Their conduct prior to the incident suggests that they believed that Brown could serve as a sales representative notwithstanding that preference.

The District Court also concluded that, "[h]ad Morris uttered no racial slurs during the argument, but reported the same incident to Girty, Girty would have been equally concerned with Brown's attitude and behavior." App. at 17. However, a fact finder could view the significance of Morris' comments as evidence that Morris' recommendation to Girty that Brown's contract be terminated was motivated by racial animus. Thus, as Brown argues, the question is "not whether the same decision would have been made had Morris not made the comments to [Brown,] but rather, would the same decision have been made if [Brown's] race was taken out of the equation." Appellant's Br. at 38.

Indeed, the District Court essentially concluded that Craftmatic was entitled to terminate Brown's contract because, following what were at the very least racially insensitive remarks, she engaged in a heated verbal altercation with Morris. Although the District Court was surely correct that Girty "would be justifiably concerned that one of [his sales representatives] would participate in a heated verbal exchange" with a customer, a fact finder may conclude that the incident between Morris and Brown could not legitimately form the basis for such a concern given Morris' discriminatory comments. Nothing in the record suggests that Brown would have conducted herself as she did but for Morris' comments.[6]

Finally, although the District Court did not rely on this ground, Craftmatic contends that we may affirm the summary judgment order because Pesta recommended to Girty that Brown's contract be

6. Brown did refuse to shake Morris' hand before Morris made the improper statements, but the District Court did not conclude that Girty would have terminated her contract based on that refusal in and of itself. Girty stated at his deposition that his concern was that Brown's "behavior as it was described to me that day ... would have ever been presented to one of our customers." App. at 362. This testimony does not compel the inference that Girty would have terminated Brown's contract simply on the basis of her refusal to shake Morris' hand.

terminated in light of her failure to complete her training assignments. However, as noted above, Girty stated at his deposition that Pesta did not give him any information on which he based the decision to terminate Brown's contract, but rather that he (Girty) made the decision based entirely on his discussion with Morris. Indeed, Girty further stated that Pesta later told him that Brown had completed her assignments and that he did not have any problems with her work. Thus, Craftmatic cannot rely on this evidence to demonstrate it would have made the decision to terminate Brown's contract regardless of her race.

It is important that we emphasize that we are not holding that Brown has proven her case of racial discrimination. What she has shown is that there are disputed facts and inferences on issues material to the disposition. We conclude that the District Court erred in granting Craftmatic summary judgment on Brown's section 1981 claim that her termination was motivated by racial animus because there remain questions for a jury regarding whether Craftmatic would have terminated Brown's contract absent consideration of her race.[7] We will therefore reverse the District Court's grant of summary judgment as to the section 1981 claim and remand for further proceedings.

## IV.

For the above-stated reasons, we will affirm the District Court's summary judgment order as to all of Brown's claims under Title VII and the PHRA as well as her section 1981 claims for a hostile work environment and retaliation. We will reverse the District Court's summary-judgment order as to Brown's claim under section 1981 that Craftmatic's termination of her contract was motivated by impermissible racial animus.

JORDAN, Circuit Judge, concurring.

I concur in the judgment in this case and am almost entirely in agreement with my colleagues in the Majority, but I write separately to express my view that, contrary to dicta in footnote five of the Majority Opinion, the Supreme Court's decision in *Gross v. F.B.L. Financial Services,* ——— U.S. ———, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), may well have an impact on our precedent concerning the analytical approach to be taken in employment discrimination cases under § 1981. While I cannot say with certainty, particularly when the parties have not joined the issue, that the analysis in *Gross* does have implications for § 1981 cases, I am not as sure as the Majority appears to be that it does not.

In *Gross,* a case concerning the Age Discrimination in Employment Act ("ADEA"), the Supreme Court bypassed the issue on which it had originally granted certiorari, i.e., "whether a plaintiff must 'present direct evidence of discrimination in order to obtain a mixed-motive instruction in a non-Title VII discrimination case[,]'" *id.* at 2348 (quoting petition for certiorari), and went to the more fundamental issue of "whether the burden of persuasion ever shifts to the party defending an alleged mixed-motives discrimination claim brought under the ADEA." *Id.* The Court decided that the burden-shifting framework that had developed in Title VII cases under *Price Waterhouse v. Hopkins,*

---

7. In light of our decision to reverse the District Court's summary-judgment order based on the *Price Waterhouse* analysis, we need not separately analyze Brown's claim pursuant to the *McDonnell Douglas* pretext analysis. Given our rejection of the District Court's conclusion that Craftmatic proved, as a matter of law, that it would have terminated Brown's contract regardless of her race, Brown should be able to pursue both theories on remand.

490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), is not applicable in ADEA cases, despite years of lower court precedent to the contrary, *e.g., King v. United States,* 553 F.3d 1156, 1160 (8th Cir.2009) ("Under the ADEA, employers are forbidden from taking adverse employment actions against employees because of their age.... Where the plaintiff presents direct evidence of discrimination, the court analyzes her claim under the mixed-motives framework established in *Price Waterhouse v. Hopkins* ...."); *Machinchick v. PB Power, Inc.,* 398 F.3d 345 (5th Cir. 2005) (Plaintiffs proceeding under the ADEA "presenting direct evidence of age discrimination may proceed under the 'mixed-motive' analysis set forth in *Price Waterhouse v. Hopkins.*"); *E.E.O.C. v. Warfield–Rohr Casket Co., Inc.,* 364 F.3d 160, 164 n. 2 (4th Cir.2004) (noting that, following the amendment of Title VII, "ADEA mixed-motive cases remain subject to the burden-shifting rules of *Price Waterhouse.*" (citation omitted)); *Vesprini v. Shaw Contract Flooring Services, Inc.,* 315 F.3d 37, 40–41 (1st Cir.2002) (applying *Price Waterhouse* to ADEA claim).

Laying special emphasis on avoiding assumptions in statutory interpretation, the Supreme Court said that it had to be "careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross,* 129 S.Ct. at 2349 (quoting *Federal Express Corp. v. Holowecki,* 522 U.S. 389, 128 S.Ct. 1147, 1153, 170 L.Ed.2d 10 (2008)). Then, looking to the language of the ADEA, it determined that, since the statute says "[i]t shall be unlawful ... to fail or refuse to hire or to discharge any individual or otherwise discriminate ... because of such individual's age[,]" 29 U.S.C. § 623(a)(1), and since "[t]he words 'because of' mean 'by reason of: on account of[,]'" *Gross,* 129 S.Ct at 2350 (quoting 1 Webster's Third New International Dictionary 194 (1966)), the plain meaning of the ADEA's statutory text requires a pure "but for" causation standard, with the plaintiff bearing the burden of proving by a preponderance of the evidence that, but for the defendant-employer's unlawful motive, the complained-of employment action would not have occurred. *Id.* at 2351. That straight-forward allocation of the burden of proof is in keeping with "the ordinary default rule" that, when a statute is silent about the burden of proof, "plaintiffs bear the risk of failing to prove their claims." *Id.* (internal quotation and citations omitted).

In the present case, the Majority concludes that, despite the foregoing instruction from *Gross,* Title VII-style burden shifting naturally controls in § 1981 cases. As the Majority sees it, because § 1981 does not contain the same "because of" clause found in the ADEA, *Gross* is simply inapposite. There is an irony here. While recognizing a textual distinction between the ADEA and § 1981, the Majority's approach ignores the textual distinctions between Title VII and § 1981. Moreover, it ignores the fundamental instruction in *Gross* that analytical constructs are not to be simply transposed from one statute to another without a thorough and thoughtful analysis. Even when there has been such analysis, later arising Supreme Court precedent may require reevaluation.

It is true, of course, that we are bound by our own precedent and, as the Majority rightly recognizes, our prior opinions indicate that § 1981 claims must be analyzed under the same framework as Title VII claims were under *Price Waterhouse* before the 1991 amendments to Title VII.[8]

---

8. The 1991 Civil Rights Act amended Title VII to allow for mixed-motive claims where a

Maj. Op. at 182 (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir.1999)). Nevertheless, it seems quite possible that, given the broad language chosen by the Supreme Court in *Gross*, a critical re-examination of our precedent may be in order.[9] I do not presume to say how any such re-examination may turn out. I only note that, though my colleagues are untroubled by § 1981's lack of a mixed-motive provision and though they assert that the *Price Waterhouse* analysis may be grafted onto § 1981 because the "plain language of the statutory text suggests" as much (Maj. Op. at n. 5), I am less able to perceive the suggestion they see or to accept that it trumps what the statute actually says.

Since the impact of *Gross* on our § 1981 precedents has not been tested by the adversarial process and we are thus without a proper basis for considering how, if at all, a change in the allocation of the burden of proof might affect this case, I am left to agree with the Majority that, consistent with the *Price Waterhouse* standard, Brown has presented direct evidence of discrimination and, under a mixed-motive analysis, has raised an issue that must be considered by a jury. In short, because Brown has raised a triable issue of fact as to whether Craftmatic's decision to terminate her was tainted by racial animus, the burden will be on Craftmatic to demonstrate to a jury that it would have made the same employment decision irrespective of Brown's race.

plaintiff demonstrates that race was "a motivating factor" for the employer's challenged action. 42 U.S.C. § 2000e-2(m). No analogous amendment was made to section 1981. Rather than viewing the lack of Congressional action as an oversight, *Gross* instructs that we should regard Congress's decision to amend one statutory provision without amending a separate provision as deliberate. *Gross*, 129 S.Ct. at 2349 ("We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."); cf. *Glanzman v. Metropolitan Mgmt. Corp.*, 391 F.3d 506, 512 n. 3 (3d Cir.2004) (concluding that "the Civil Rights Act of 1991 does not apply to ADEA cases"). Much as the decision not to amend the ADEA under the Civil Rights Act of 1991 was considered instructive in *Gross*, it has been seen to be so with respect to § 1981. *See Mabra v. United Food & Commercial Workers Local Union No.1996*, 176 F.3d 1357, 1358 (11th Cir.1999) ("[T]he 1991 mixed-motive amendments to Title VII do not apply to § 1981 claims.").

9. Beyond its statutory analysis of the ADEA and the implications that may carry for § 1981 cases, the Court also raised questions about burden-shifting in general, saying "[w]hatever the deficiencies of *Price Waterhouse* in retrospect, it has become evident in the years since that case was decided that its burden-shifting framework is difficult to apply." *Gross*, 129 S.Ct. at 2352.