**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 13-1916

———

ANN TOLAN
                    Appellant

v.

TEMPLE HEALTH SYSTEM TRANSPORT TEAM, INC.

———

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(District Court No. 09-CV-5492)
District Court Judge: Honorable J. William Ditter

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 13, 2014

Before:  CHAGARES, SHWARTZ, and GARTH, *Circuit Judges*

(Opinion Filed:  February 18, 2014)

———

OPINION OF THE COURT

———

GARTH, *Circuit Judge*.

Appellant, Ann Tolan, appeals from an order of the District Court granting summary judgment to Defendant-Appellee, Temple Health System Transport Team, Inc. ("T3").[1]

We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons that follow, we will affirm the judgment of the District Court.

I

Because we write principally for the benefit of the parties, we recite only those facts necessary to our disposition.

Tolan was briefly employed by T3 from April 28, 2008 until July 30, 2008. T3 employs approximately 45 individuals and is responsible for transporting critically injured or ill patients from one acute care facility to another. In April 2008, Tolan applied for a position as a pool Transport Specialist (a per diem position) and was interviewed for the position by Thomas Kurtz, Director of Operations at T3, and Justine Ryales, Administrative Assistant. Tolan was a licensed registered nurse ("RN") with hospital work experience at the time of her interview. Tolan did not have a Pre-Hospital Nurse Certification ("PHRN").

T3 hired Tolan on April 28, 2008 and arranged to pay for her to take classes at the Starr Institute ("Starr") in order for her to obtain her PHRN while contemporaneously working for T3. While Tolan was not to be compensated for class time, she was told that if she did not pass this course, T3 would terminate her

---

[1] By oral motion, T3 was substituted for Temple Physicians, Inc. as the proper defendant.

employment. Upon hiring Tolan, T3 placed her on a standard, introductory 90-day probation period. Tolan was aware of this probationary period.

While she was employed by T3, Tolan reported directly to Kurtz. Although she was hired at the end of April 2008, Tolan was not assigned to work her first shift until early to mid July 2008.

Around mid July 2008, Tolan began attending classes at the Starr Institute. She attended classes for 24 hours per week for two weeks, until her eventual termination at the end of July. With Kurtz, she arranged to work weekends, while taking classes during the week.

Before she was eventually terminated, Tolan worked three full 12-hour shifts and two additional shifts when she left early. Tolan's first two shifts in early July 2008 passed without incident, and she had no issues with any other T3 employees. On July 20, 2008, however, Tolan reported for her third shift and found that only a paramedic, as opposed to an RN, was available to train her. Because Tolan preferred training with an RN rather than a paramedic, she asked if she could go home. Her co-worker, Eric Rosen, advised her to contact Carl Homa, the Administrative Director of Clinical Affairs who was the "on-call Administrator" that day, in order to determine what Tolan should do. Homa told Tolan that she could go home.

Later that day, Tolan e-mailed Kurtz to explain why she left her shift early. No corrective action was issued due to Tolan's decision not to train with the paramedic or for her leaving early.

On July 26, 2008, during Tolan's next shift, she and a co-worker, Michael Squillace, had a verbal altercation. Squillace, also an RN, was serving as Tolan's preceptor for that particular shift and told Tolan that she was responsible for completing the charts and checking the ambulance. Tolan and Squillace subsequently argued about Tolan's job requirements, her attitude, and her need for assistance from Squillace.

The following day, Tolan e-mailed Kurtz describing the incident with Squillace and said that she "preferred not to orient with Mr. Squillace and that she refused to be 'berated' because she was 'new.'" Kurtz said that he would investigate the incident. Squillace subsequently apologized to Kurtz for not discussing his expectations with Tolan in private – a violation of T3 policies that required private dispute resolution. As a result, Squillace was issued a corrective action notice.

Additionally, during Tolan's employment at T3, she was allegedly late to one of her shifts and arrived on a day when she was not scheduled to work and behaved erratically, pacing and calling herself "a moron."

Issues also arose during Tolan's class attendance at the Starr Institute. Two nurses employed by Children's Hospital of Philadelphia ("CHOP"), Millicent Green and Agnes Saxvanderweyden, complained that Tolan had behaved in a way that was "unprofessional" and "distracting," and caused both women to feel "uncomfortable," "embarrassed," and "threatened." Specifically, Green and Saxvanderweyden reported the following conduct: (1) Tolan's pantomime of an

4

allergic reaction to a latex condom after oral sex; (2) her over-dramatization of medical situations; (3) her simulation of a priapism (an extended erection) by placing a water bottle in her pants; (4) her refusal to get into an ambulance during a medical scenario because "she was getting her high on and didn't want them messing with [her] buzz"; and (5) her waving a Taser at Saxvanderweyden. The CHOP nurses complained to their nurse manager, who in turn reported the complaints to Ted Goldman, the Director of Operations at Starr. After receiving the complaints, Goldman notified Kurtz and Dr. Gerald Wydro, Program Director of T3, who testified that this behavior was unacceptable and unheard of in his over 20 years of experience.

In late July, Kurtz and other T3 managers discussed extending Tolan's probationary period in light of her limited shift time over the course of her employment. On July 30, 2008, Kurtz, Homa, and Wydro, met with Tolan to address the extension of the probation period as well as the complaints from Starr. Kurtz, Homa, and Wydro wanted an explanation for Tolan's alleged inappropriate behavior and were "considering several options depending on her explanation." Tolan also had complaints that she wished to raise at the meeting, including her inability to schedule her first shift before July as well as fatigue or disinterest on the part of her preceptors.

During the meeting, Tolan was told about the issues at Starr and did not deny that she had behaved as alleged. Following a discussion of her complaints and T3's concerns, Tolan's employment with T3 was terminated.

5

Tolan claims that she spoke with Goldman on August 1, 2008, after her termination, and that he told her that "her problem was not with the Starr Institute, but with Temple." Tolan also testified at her deposition that he "clearly told me that there were not [sic] complaints about me and I was not failing my PHRN." However, she later testified that she was "not sure if he . . . said [Tolan] had no problem at Star Institute."

On November 18, 2009, Tolan filed a complaint in the U.S. District Court for the Eastern District of Pennsylvania, alleging that she was subject to gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

Following discovery, T3 filed a motion for summary judgment on August 29, 2011. T3 argued that Tolan had not offered any evidence that she (or any other female T3 employee) was treated less favorably than any similarly situated male T3 employee, subjected to discriminatory treatment, or otherwise discriminated against because of gender. T3 also argued that it had fired Tolan because of her inappropriate conduct during the Starr course and the series of incidents, discussed *supra*, that occurred during her shifts with T3, which T3 alleged were indicative of her "poor judgment and resistance to being a team player." In response, Tolan argued *inter alia*, that: (1) there was only one other female employee working as a transport nurse during her employment and she

6

warned Tolan that "they treat you like shit";[2] (2) the other employees available to train her were male; and (3) Squillace "treated Plaintiff unfairly on the job" based on the dispute that occurred on July 26; (4) Squillace did not "berate or belittle any of the male employees;" and (5) Squillace, a male RN, was not terminated for the altercation while she was. While Tolan did not deny that the other incidents that T3 cited took place, she argued generally that they were irrelevant to her discharge.

On February 26, 2013, the District Court granted T3's motion for summary judgment. In so ruling, the District Court held, *inter alia*, that Tolan had abandoned her retaliation claim by failing to respond to T3's arguments. This timely appeal followed.

II

We review a district court's grant of summary judgment *de novo*. Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir. 2011). We must determine, therefore, whether the record, when viewed in the light most favorable to the non-movant, shows that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

III

---

[2] It is unclear to whom the female co-worker was referring when she said "you" (*i.e.*, women, nurses, employees, etc.).

On appeal, Tolan raises three primary arguments: (1) the District Court erred in granting summary judgment to T3 on Tolan's Title VII discrimination claim under a pretext theory using the McDonnell Douglas burden-shifting analysis;[3] (2) the District Court erred in granting summary judgment to T3 on Tolan's Title VII discrimination claim under a "mixed-motive" theory;[4] and (3) the District Court erred in holding that Tolan had waived her retaliation claim by failing to respond to T3's arguments regarding retaliation. For the following reasons, we do not find that these arguments have merit. Accordingly, we will affirm the judgment of the District Court.

A

A plaintiff in a Title VII discrimination action may state a claim under either the pretext theory articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or the mixed-motive theory set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), "under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008).

---

[3] See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

[4] The District Court concluded that the mixed-motive framework was not the appropriate lens through which to view Tolan's claim; however, the Court held that "under either the mixed-motive or pretext standard, Tolan would not be successful and I find it unnecessary to analyze this case under the mixed-motive framework." Tolan v. Temple Health Sys. Transp. Team, Inc., No. 09-CV-5492, 2013 WL 706049, at *3 n.8 (E.D. Pa. Feb. 26, 2013).

If a plaintiff attempts to prove a claim under a pretext theory, then the three-step burden-shifting analysis announced in McDonnell Douglas applies. Id. (citing McDonnell Douglas, 411 U.S. at 802-04); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002).

> Under that familiar test, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

Makky, 541 F.3d at 214 (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (en banc)).

If a plaintiff satisfies the first McDonnell Douglas requirement and establishes a *prima facie* case of discrimination, then an inference of discriminatory motive arises, shifting the burden to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Further, we have noted that this burden is "relatively light" and that "[t]he employer need not prove that the tendered reason actually motivated its behavior. . . ." Id. "If the defendant does so, the inference of discrimination drops

9

and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." Makky, 541 F.3d at 214.

In this case, as to the first McDonnell Douglas step, Tolan contends that the District Court correctly held that she had shown a *prima facie* case of discrimination before incorrectly holding that she had failed to show that T3's proffered explanation for her termination was pretextual. As a preliminary matter, we note that the District Court *did not* hold that Tolan had made out a *prima facie* case of discrimination; rather, the Court, consistent with T3's argument before it, assumed for purposes of the motion that Tolan had satisfied this requirement and instead focused on the inquiry into pretext.[5] Because the argument before us focuses primarily on T3's reasons for terminating Tolan's employment, and because we hold that Tolan has failed to show that T3's purported reasons for firing Tolan were pretextual, we similarly assume – without deciding – the sufficiency of the *prima facie* case and instead direct our attention to the two latter McDonnell Douglas steps (*i.e.*, the presence of a legitimate, non-descriminatory motive and the allegation of the employer's pretext).

As to the second step, T3 has met its burden by articulating a legitimate, non-discriminatory motivation for terminating Tolan's employment. T3 met this

---

[5] See Tolan, 2013 WL 706049, at *4 ("While I question whether the above claims, even considered in the light most favorable to plaintiff, would show that Tolan was discriminated against based on her gender and be sufficient to meet even the relatively low hurdle of a prima facie case, I will assume for purposes of deciding the motion for summary judgment that she has met this burden.").

burden by identifying the following incidents as precipitating their decision to terminate Tolan's employment: (1) Tolan's refusal to train with a paramedic during her third shift; (2) Tolan's public argument with Squillace; (3) Tolan's failure to arrive on time for one of her shifts; (4) Tolan's arrival at the hospital and subsequent strange behavior on a day on which she was not scheduled to work; (5) Tolan's inappropriate behavior during her classes at Starr; and (6) her failure to deny any of these incidents or acknowledge the inappropriateness of her behavior during her classes. T3 contends that these incidents demonstrated, *inter alia*, Tolan's "poor judgment and resistance to being a team player." Accordingly, mindful of the "relatively light" burden borne by T3 at this step,[6] we conclude that T3 has provided a sufficient legitimate, non-descriminatory motive for terminating Tolan's employment.

As to the third step, Tolan has failed to show that there is a genuine issue of material fact regarding the allegedly pretextual nature of T3's reasons for firing her.

> To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

---

[6] Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)); see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting Fuentes, 32 F.3d at 764).  Further, a plaintiff's arguments relating to credibility "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  However, a plaintiff is not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment.  Burton, 707 F.3d at 427; cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

While Tolan makes a number of arguments to the effect that she actually *was* a good team player and that she performed her job well, the only evidence she offers to rebut *the specific incidents* identified by T3 is her August 1 conversation with Goldman, which she claims is proof that T3 never received complaints about her from Starr.  Tolan contends that Goldman's "comments to [her] preclude the entry of summary judgment on her gender discrimination claim."  Appellant's Br. At 19.

As noted *supra*, T3 has stated that it learned of Tolan's behavior from Starr and that its decision to terminate Tolan was due in part to these reports and her

12

failure to deny them. The statement of an individual who was not employed by T3 or involved in the decision to terminate Tolan – even if true and read as Tolan wishes us to – does not create a genuine issue as to pretextuality. Further, even if we were to conclude that the conversation with Goldman were somehow able to satisfy Tolan's burden at this step in raising an issue as to the complaints from Starr, T3 has offered numerous other legitimate, non-desciriminatory reasons (*e.g.*, her lack of punctuality, the confrontation with Squillace, her refusal to train with a paramedic, *etc*.) that Tolan fails to rebut.

Accordingly, we conclude that the District Court properly granted T3's motion for summary judgment under a pretext theory.

B

As is well established, however, the McDonnell Douglas burden shifting framework does not govern every Title VII discrimination claim. See Makkey, 541 F.3d at 214-15. Under the alternative, "mixed-motive" analysis,

> if the plaintiff shows "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," the burden shifts to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor."

Brown v. J. Kaz, Inc., 581 F.3d 175, 182 (3d Cir. 2009) (quoting Price Waterhouse, 490 U.S. at 276 (O'Connor, J., concurring)). In order to trigger a mixed-motive framework, "a plaintiff need only present *sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence*, that 'race, color,

13

religion, sex, or national origin was a motivating factor for any employment practice.'" Makky, 541 F.3d at 214 (quoting Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003)) (emphasis added).

In this case, as discussed *supra*, Tolan's proffered proof of discrimination (*i.e.*, the comments from her female coworker; the gender composition of T3's staff; her confrontation with Squillace) fails to make this case an appropriate forum for mixed-motive analysis. Accordingly, the District Court properly granted summary judgment to T3 and declined to analyze the facts of this case using a mixed-motive rubric.

C

Finally, as to Tolan's claim that the District Court improperly determined that her retaliation claim had been waived, we conclude that even if the District Court were mistaken, any such error was harmless, as Tolan's retaliation claim is wholly unsupported by the record.

Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must provide evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a

14

causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir.1995)). "[T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII. . . ." Id. (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)).

In this case, Tolan's retaliation claim amounts to an assertion that she informed Kurtz about her confrontation with Squillace and was fired as a result of this complaint. She points to the close temporal relationship between her email to Kurtz and her termination as not only demonstrating a causal connection, but also demonstrating that T3's reasons for firing her were pretextual.

While temporal proximity is certainly a factor that may indicate a causal link between protected conduct and retaliatory action, see Farrell v. Planters Life Savers Co., 206 F.3d 271, 279 (3d Cir. 2000), Tolan has failed to provide any evidence that she engaged in protected conduct. There is no evidence in the record to suggest that Tolan informed Kurtz that Squillace had discriminated against her or argued with her because of her gender. Instead, Tolan informed Kurtz that she "preferred not to orient with Mr. Squillace and that she refused to be 'berated' because she was 'new.'" Because describing a confrontation with a fellow employee without reference to gender discrimination or any other interest

15

articulated in Title VII does not amount to protected conduct under Title VII, Tolan's retaliation claim against T3 was without merit and was properly disposed of by the District Court.

The Judgment of the District Court will therefore be affirmed.