**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1452

———————

MATTHEW FAUSH,

Appellant

v.

TUESDAY MORNING, INC.

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. Civ. No. 2-12-cv-07137)

District Judge: Honorable Luis Felipe Restrepo

———————

Argued: December 9, 2014

Before: FUENTES, FISHER, and KRAUSE, *Circuit Judges*

(Opinion Filed: November 18, 2015)

Wayne A. Ely, Esq. ***ARGUED***
Timothy M. Kolman, Esq.
W. Charles Sipio, Esq.
Kolman Ely PC
414 Hulmeville Avenue
Penndel, PA 19047
*Attorneys for Appellant*

Stephen C. Baker, Esq.
Alan M. Kidd, Esq.
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
*Attorneys for Appellees*


Molly B. Cowan, Esq.
Robert E. Luxen, Esq. ***ARGUED***
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge.

Appellant Matthew Faush is an African-American employee of Labor Ready, a staffing firm that provides temporary employees to several clients, including Appellee Tuesday Morning, Inc. According to Faush, Labor Ready assigned him to work at one of Tuesday Morning's stores, where he was subjected to racial slurs and racially motivated accusations and was eventually terminated.

Faush filed suit against Tuesday Morning, claiming violations of Title VII and the Pennsylvania Human Relations Act, among other statutes. The District Court granted

2

summary judgment to Tuesday Morning on the ground that, because Faush was not Tuesday Morning's employee, Tuesday Morning could not be liable for employment discrimination. Because a rational jury applying the factors announced by the Supreme Court in *Nationwide Mutual Insurance Co. v. Darden* could find on these facts that Faush was Tuesday Morning's employee for purposes of Title VII and the Human Relations Act, we vacate in part the grant of summary judgment and remand for further proceedings.

## I. Factual and Procedural Background

### A. The Underlying Dispute

Matthew Faush was employed by Labor Ready, a staffing firm that provides temporary employees to a number of clients, including closeout home-goods retailer Tuesday Morning, Inc. Over the course of a month, Labor Ready sent temporary employees to a new Tuesday Morning store in Pennsylvania overseen by store manager Keith Davis. The temporary employees were asked to unload merchandise, set up display shelves, and stock merchandise on the shelves in preparation for the store's opening the following month. Faush was assigned to the store for ten days; each day, he generally worked for eight hours with nine other temporary employees.

Faush alleges in his complaint that when he and other African-American temporary employees were working at the Tuesday Morning store, Davis accused them of stealing two eyeliner pens, insisting that "[his] people wouldn't do that." (App. 30 ¶ 18.) A few days later, the store owner's mother told Faush and two other African-American temporary employees to work in the back of the store with the garbage

3

until it was time to leave. When Faush and his coworkers went to speak with Davis, a white employee blocked their path and referred to them using a racial slur. Davis refused to hear their complaints regarding the slur. Instead, he informed them that he would not let them on the floor because an alarm had been triggered and he was concerned about loss prevention. Faush alleges that he and his African-American coworkers were "terminated," but his complaint provides no further detail. (App. 31 ¶ 34.)

Faush filed suit against Tuesday Morning in federal court for racial discrimination in violation of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981. The parties conducted limited discovery on the threshold issue of whether Faush could be considered Tuesday Morning's employee. Tuesday Morning subsequently filed a motion for summary judgment on the grounds that it had never employed Faush or entered into a contract with him, as is a predicate for his various claims.

## B. The Summary Judgment Evidence

Labor Ready assigned Faush to work at a Tuesday Morning store under an "Agreement to Supply Temporary Employees" (the "Agreement") between Labor Ready and Tuesday Morning. (App. 55.) There was no contract between Faush and Tuesday Morning, and Faush never formally applied for employment at the store.

Labor Ready provided the temporary employees with time cards on which they recorded the amount of time they spent working at Tuesday Morning. Under the Agreement, Tuesday Morning was expected to "approve [the] time card for each [temporary employee], or otherwise accurately report

4

the daily hours worked." (App. 56 ¶ 2(a).) Accordingly, at the end of each day, Davis signed a document indicating how many hours each temporary employee had worked. Labor Ready billed Tuesday Morning $13.52 per hour of work plus tax.

If a temporary employee was unable to report to work at the store, he or she was expected to inform Labor Ready rather than Tuesday Morning. Once a temporary employee was at the store, however, the Agreement provided that Tuesday Morning was "responsible for supervising and directing [his or her] activities." (App. 55, 56 ¶ 4(a).) Tuesday Morning acknowledged that Labor Ready was "not a licensed general contractor or subcontractor," was not responsible for Tuesday Morning's project, and would "not be providing supervision services for its [temporary employees]." (App. 55, 56 ¶ 4(a)-(b).) Indeed, Tuesday Morning was required to provide any necessary "site specific safety orientation and training," as well as any "Personal Protective Equipment, clothing, or devices necessary for any work to be performed." (App. 56 ¶ 3(a).)

Tuesday Morning was expected to determine whether the temporary employees met its "skill, competency, license, experience, or other requirements, and only assign [them] duties consistent with their skills and abilities." (App. 56 ¶ 2(d).) The Agreement did not permit Tuesday Morning to "entrust [temporary employees] with the care of unattended premises, custody or control of cash, credit cards, valuables or other similar property," or to "allow [temporary employees] to operate machinery, equipment or motor vehicles without [Labor Ready's] prior written permission." (App. 56 ¶ 4(c).)

5

Davis, the Tuesday Morning store manager, testified at his deposition that he had "supervisory control over the temporary employees," trained them to assemble shelves, and "assigned them tasks to perform on a daily basis." (App. 101, 104.) Significantly, the work they were assigned was no different from the work Davis assigned to his own employees. Davis further testified that the temporary employees were "a stop[gap] measure" because his store was "brand new" and did not yet have "a full compl[e]ment of Tuesday Morning employees." (App. 104.)

A Labor Ready supervisor did visit the store on two occasions. On her first visit, she ensured that the temporary employees were moving at an acceptable pace, but the tasks were assigned by Davis, and the Labor Ready supervisor passed Davis's instructions on to the temporary employees. On the second visit, she simply verified that all of the temporary employees were present.

None of the temporary employees was provided with a key to the store. At his deposition, however, Davis referred to the "assistant managers of the store" as his "key holders." (App. 101.) Presumably, then, not every permanent employee at Tuesday Morning was provided with a key.

Pursuant to the Agreement, if Tuesday Morning was "unhappy with any [temporary employee] for any reason," it could inform Labor Ready "within the first two (2) hours," and Labor Ready would "send out a replacement immediately." (App. 55.) Davis testified that Tuesday Morning regional manager Kathy Beromeo had the authority to request that a temporary employee not be allowed to return to the store; however, to his knowledge, this never occurred. Tuesday Morning had no authority to terminate a temporary

employee's employment with Labor Ready, although the record is silent as to what, if any, other temporary employment would be made available to a temporary employee by Labor Ready if that employee were rejected by Tuesday Morning. And after Faush ended his work at the store, Tuesday Morning never received any claim for unemployment compensation benefits.

Labor Ready set the temporary employees' pay rate; paid their wages, taxes, and social security; maintained workers' compensation insurance on their behalf; and completed their I-9 employment eligibility verification forms. Tuesday Morning, on the other hand, never had Faush's social security number.

In certain respects, however, Tuesday Morning shared responsibility for the wages paid to the temporary employees. As explained above, Tuesday Morning paid Labor Ready for each hour worked by each temporary employee. The Agreement provided that Labor Ready could adjust the rates charged to Tuesday Morning to reflect increases in its "actual or government mandated cost for wages, withholding amounts, governmental taxes, assessments, health care, [and] Workers' Compensation insurance." (App. 55, 56 ¶ 2(f).) Tuesday Morning could also be required to "pay overtime charges as applicable to overtime paid according to law." (App. 56 ¶ 2(b).) Moreover, the Agreement required Tuesday Morning to notify Labor Ready "if a prevailing wage, living wage, or any other government mandated minimum statutory wage should be paid to [temporary employees]" and did not "relieve[] [Tuesday Morning] of its primary responsibility for ensuring complete and accurate compliance with all local, state, and federal laws relating to prevailing wages." (App. 56 ¶ 3(c).)

7

Finally, the Agreement required both Labor Ready and Tuesday Morning to "comply with all applicable federal, state and local laws and regulations concerning employment, including but not limited to: wage and hour, breaks and meal period regulations, the hiring and discharge of employees, Title VII and the FLSA." (App. 56 ¶ 3(b).) Moreover, both companies pledged to "provide a workplace free from discrimination and unfair labor practices." (*Id.*)

## C. The Decision of the District Court

The District Court granted Tuesday Morning's motion for summary judgment. Weighing the factors relevant to the existence of an employment relationship, it held that Tuesday Morning was not Faush's employer and, consequently, could not be liable under Title VII or the Pennsylvania Human Relations Act.[1] The District Court further held that Faush could not pursue his § 1981 claim because he had not attempted to enter into any contract with Tuesday Morning. Faush filed a timely notice of appeal.[2]

---

[1] The District Court, in the absence of precedential authority within this Circuit, understandably relied on three non-precedential opinions in reaching its conclusion. Aside from their non-precedential status, however, those cases involved pro se plaintiffs who presented virtually no evidence in opposition to summary judgment and thus are readily distinguishable.

[2] The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. We have jurisdiction to review the District Court's final order granting summary judgment pursuant to 28 U.S.C. § 1291.

8

## II. Discussion

We first address Faush's claims under Title VII and the Pennsylvania Human Relations Act, then his claim under § 1981.

### A. Title VII and the Pennsylvania Human Relations Act

### 1. The necessity of an employment relationship

Title VII forbids, among other things, "status-based discrimination by employers, employment agencies, labor organizations, and training programs." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2530 (2013) (citing 42 U.S.C. § 2000e-2(a)-(d)). Faush alleges that Tuesday Morning was his "employer" and discriminated against him on the basis of race. Accordingly, in order to prevail on his Title VII claim, he must demonstrate the existence of an "employment relationship" with Tuesday Morning. *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013).[3]

---

[3] Certain Courts of Appeals have held that a defendant may be liable for interfering with employment opportunities even if that defendant is not the plaintiff's employer, while others reject this theory of liability. *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 373-76 (2d Cir. 2006) (discussing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) and collecting cases from other circuits). As Faush does not argue that Tuesday Morning is liable on this basis, we need not consider this possibility.

Claims brought under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.*, are generally "'interpreted coextensively with Title VII claims.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 n.1 (3d Cir. 2009) (quoting *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006)). Although the Act protects certain limited categories of independent contractors that Title VII does not, *see id.* at 179 n.1, Faush does not invoke these protections or dispute that he must demonstrate an employment relationship to prevail on his state-law claim.

### 2.     The *Enterprise* test versus the *Darden* test

The parties dispute the appropriate test for an employment relationship. Faush argues that the test for "joint employers" articulated in *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462 (3d Cir. 2012), should apply in this context. Tuesday Morning argues that the test announced in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), applies instead. Both parties contend that they win regardless of which multi-factor test applies, and the two tests are indeed quite similar. As a doctrinal matter, however, it is clear that the *Darden* test applies to Title VII cases, while the *Enterprise* test does not.

In *Darden*, the Supreme Court was called upon to construe the term "employee" in the Employee Retirement Income Security Act ("ERISA"). Because the definition of "employee" in ERISA "is completely circular and explains nothing," *Darden*, 503 U.S. at 323, the Court concluded, as it had in similar situations, "'that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine,'" *id.* at 322-23 (quoting *Cmty.*

10

*for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989)). Because Title VII's definition of "employee" is similarly devoid of content, the common-law test outlined in *Darden* governs in the Title VII context as well. *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 211-12 (1997); *Covington*, 710 F.3d at 119; *Brown*, 581 F.3d at 180.[4]

---

[4] One of our cases appears, at first glance, to complicate the picture. In *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997), we considered whether clerks who were formally employed by the judicial branch of Pennsylvania could also pursue Title VII claims against the county in which their court sat. We reasoned that although "the courts are considered the employers of judicial personnel[,] . . . this fact does not preclude the possibility that a county may share co-employer or joint employer status with the courts[] . . . [if both] entities exercise significant control over the same employees." *Id.* at 727. Rather than expressly considering the *Darden* factors, we drew guidance from cases assessing "joint-employer status" in the context of the National Labor Relations Act, and we concluded that the clerks had sufficiently alleged that the judicial branch had "delegate[d] employer-type responsibilities to [the] county." *Id.* The factors considered for purposes of the National Labor Relations Act are, however, essentially the same as those listed in *Darden*. *See N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982); *G. Heileman Brewing Co. v. N.L.R.B.*, 879 F.2d 1526, 1531 (7th Cir. 1989). This is because the word "employee" in the National Labor Relations Act, as in ERISA and Title VII, is intended to convey the common-law meaning of the term. *See N.L.R.B. v. Town & Country Elec., Inc.* 516 U.S. 85, 94 (1995); *Darden*, 503 U.S. at 324-35.

11

The *Enterprise* test, by contrast, applies "[w]hen determining whether someone is an employee under the [Fair Labor Standards Act ("FLSA")]." *Enterprise*, 683 F.3d at 467. The definition of "employee" in the FLSA is of "striking breadth" and "cover[s] some parties who might not qualify as such under a strict application of traditional agency law principles." *Darden*, 503 U.S. at 326. Accordingly, the "textual asymmetry" between Title VII and the FLSA "precludes reliance on FLSA cases." *Id.* Instead, the sole question before us is whether the common law of agency would recognize a master-servant relationship.[5]

### 3. The inquiry under *Darden*

"'In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.'" *Darden*, 503 U.S. at 323 (quoting *Reid*, 490 U.S. at 751). *Darden* provides a non-exhaustive list of relevant factors, including

> "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired

---

[5] The Fourth Circuit recently adopted a "hybrid test" for joint employment in the Title VII context that incorporates both the common law of agency and the "economic realities test" used in FLSA cases. *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 413-14 (4th Cir. 2015). This test is very similar to the *Darden* test, however, and we see no reason to apply it instead of *Darden*.

party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Id.* at 323-24 (quoting *Reid*, 490 U.S. at 751-52).

Our Court has generally focused on "'which entity paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities.'" *Covington*, 710 F.3d at 119 (alteration in original) (quoting *Covington v. Int'l Ass'n of Approved Basketball Officials*, No. 08-3639, 2010 WL 3404977, at *2 (D.N.J. Aug. 26, 2010)). However, "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Darden*, 503 U.S. at 324 (second alteration in original) (quoting *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)).[6]

---

[6] As mentioned above, the *Enterprise* test is extremely similar to the *Darden* test. It considers

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged

13

The *Darden* factors assist in "drawing a line between independent contractors and employees" hired by a given entity. *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003). Significantly, the inquiry under *Darden* is not *which* of two entities should be considered the employer of the person in question. Two entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII. *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997). Indeed, at common law, one could be a "dual servant acting for two masters simultaneously" or a "borrowed servant" who by virtue of being "'directed or permitted by his master to perform services for another may become the servant of such other.'" *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991) (quoting Restatement (Second) of Agency § 227 (1958)).

### 4. Standard of review

We review the grant of summary judgment *de novo*, applying the same standard as the District Court. *Renchenski v. Williams*, 622 F.3d 315, 324 (3d Cir. 2010). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a

---

employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*Enterprise*, 683 F.3d at 469. As with the *Darden* test, this list of factors is "not exhaustive," and "other indicia of 'significant control'" may "suggest that a given employer was a joint employer of an employee." *Id.* at 469-70.

matter of law." *Massie v. U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 340, 347 (3d Cir. 2010) (citing Fed. R. Civ. P. 56(c)).

"When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party," so long as the evidence "so favors" the movant that "no reasonable juror" could render a verdict against it. *Enterprise*, 683 F.3d at 471; *see also Brown*, 581 F.3d at 180-81; *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 n.10 (3d Cir. 2008). The question of whether Tuesday Morning was Faush's employer must be left to the jury if, on the other hand, reasonable minds could come to different conclusions on the issue. *See Graves*, 117 F.3d at 729; *Williamson*, 926 F.2d at 1348.

### 5.     Faush's relationship with Tuesday Morning

The evidence marshaled by Faush is more than sufficient to preclude summary judgment. A rational jury applying the *Darden* factors could find that Faush and Tuesday Morning had a common-law employment relationship and, therefore, that Faush was Tuesday Morning's employee for purposes of Title VII and the Human Relations Act.

First, the District Court overstated the extent to which the factors pertaining to compensation cut against Faush. While Labor Ready did set the temporary employees' pay rate; paid their wages, taxes, and social security; and maintained workers' compensation insurance on their behalf, Tuesday Morning also bore certain responsibilities with respect to the temporary employees' wages. It was obligated under the Agreement to notify Labor Ready if any

15

"government mandated minimum statutory wage" should be paid to temporary employees, and it retained its "primary responsibility" for ensuring compliance with prevailing-wage laws. (App. 56 ¶ 3(c).) And Tuesday Morning was in the best position to evaluate compliance with labor laws because the temporary employees were similarly situated to Tuesday Morning's permanent employees.

Moreover, although Tuesday Morning made its payments to Labor Ready, rather than to the temporary employees, those payments were functionally indistinguishable from direct employee compensation. That is, rather than paying Labor Ready a fixed rate for the completion of a discrete project, "'a method by which independent contractors are often compensated'" *Reid*, 490 U.S. at 752 (quoting *Holt v. Winpisinger*, 811 F.2d 1532, 1540 (D.C. Cir. 1987)), Tuesday Morning paid Labor Ready for each hour worked by each individual temporary employee at an agreed-upon hourly rate and was even obligated under the Agreement to pay any overtime charges required by law. Tuesday Morning was also required to pay any changes in the rates stemming from increases in Labor Ready's costs from wages, taxes, and insurance. Essentially, Tuesday Morning indirectly paid the temporary employees' wages, plus a fee to Labor Ready for its administrative services.

Similarly, the factors pertaining to hiring and firing provide only weak support for Tuesday Morning's position. To be sure, Labor Ready was the entity that hired Faush and dispatched him to the Tuesday Morning store. Tuesday Morning obviously did not have the power to terminate Faush's employment with Labor Ready or any obligation to pay him unemployment benefits. Tuesday Morning did, however, have ultimate control over whether Faush was

16

permitted to work at its store. If Tuesday Morning was unhappy with any temporary employee for any reason, it had the power to demand a replacement from Labor Ready and to prevent the ejected employee from returning to the store. Nothing in the record suggests that Labor Ready had any policy or practice, much less obligation, to continue to pay a temporary employee who was not then on a temporary assignment or to provide an immediate alternative assignment for an employee turned away from a job. *See Ruehl v. Viacom, Inc.*, 500 F.3d 372, 380 n.6 (3d Cir. 2007) (when determining whether there is any genuine issue of material fact, we are required to "draw[] all reasonable inferences in favor of the nonmoving party").

Finally, Tuesday Morning's control over the temporary employees' daily activities overwhelmingly favors Faush.[7] Faush worked at a Tuesday Morning store, rather than at a remote site controlled by Labor Ready. Admittedly, it was of no concern to Tuesday Morning whether Faush reported to the store or whether another temporary employee showed up in his place. Once he was there, however, Tuesday Morning personnel gave Faush assignments, directly supervised him, provided site-specific training, furnished any equipment and materials necessary, and verified the number of hours he worked on a daily basis. In fact, the only time a Labor Ready

---

[7] The relevant factors mentioned in *Darden* include "'the skill required; the source of the instrumentalities and tools; the location of the work; . . . whether the hiring party has the right to assign additional projects to the hired party; [and] the extent of the hired party's discretion over when and how long to work.'" *Darden*, 503 U.S. at 323-24 (quoting *Reid*, 490 U.S. at 751).

supervisor visited the store and participated in the work, she merely relayed instructions from the Tuesday Morning manager to the Labor Ready employees, and did not, herself, exercise any supervisory functions over the Labor Ready employees. Thus, unlike a contractor relationship, in which an agency is hired to perform a discrete task and oversees its employees' work in the completion of that project, the Labor Ready employees were hired on an hourly basis to perform services under the supervision of Tuesday Morning management, which exercised control over the temporary employees' daily work activities. And although the Labor Ready temporary employees worked at the store for a more limited period, Tuesday Morning managed them in the same way it managed its permanent employees.

Also unlike a contractor relationship, the Labor Ready employees were not hired for any specialized skillset: They were merely "a stop[gap] measure" because the store was "brand new" and did not yet have "a full compl[e]ment of Tuesday Morning employees." (App. 104.) The Labor Ready employees, under the direct supervision of Tuesday Morning management, performed only unskilled tasks, such as unloading and stocking merchandise, setting up display shelves, and removing garbage. While it is true that the Agreement precluded Tuesday Morning from entrusting any temporary employee with unattended premises, valuables, machinery, or vehicles, the tasks assigned to the Labor Ready employees, according to the testimony of a Tuesday Morning manager, were *no different* than those assigned to Tuesday Morning employees.

Although not dispositive, the fact that Labor Ready and Tuesday Morning characterized Faush, and the other workers supplied, as "Temporary *Employees*," rather than

18

independent contractors also bolsters Faush's position. *See Brown*, 581 F.3d at 181 (considering the fact that the parties' agreement labeled the plaintiff an "independent contractor"); (App. 55 (emphasis added)). In the Agreement, Labor Ready expressly disavowed the notion that it was a "licensed general contractor or subcontractor." (*Id.*) Most significantly, Tuesday Morning pledged to "provide a workplace free from discrimination and unfair labor practices" and to "comply with all applicable federal, state and local laws and regulations concerning employment, including but not limited to: wage and hour, breaks and meal period regulations, the hiring and discharge of employees, Title VII and the FLSA." (App. 56 ¶ 3(b).) Evidently, Tuesday Morning agreed that it bore many of the legal responsibilities of a traditional employer, including compliance with Title VII.

Even when confronted with stronger evidence against the purported employee, we have held that a rational jury could find the existence of a common-law employment relationship. In *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, we considered whether a worker was ConRail's employee for purposes of the Federal Employers' Liability Act at the time he was injured in a workplace accident. As in the Title VII context, we looked to "the common law bases for creation of a master-servant relationship." *Id.* at 1349. Penn Trucks, a subsidiary of ConRail, had a contract with ConRail to load and unload cargo at an intermodal freight terminal owned by ConRail. The contract "expressly removed from ConRail any authority to supervise or direct the manner in which Penn Trucks performed any of its services." *Id.* at 1352. And while ConRail clerks could "assign work to Penn Trucks employees and change assignments previously given them by Penn Trucks supervisors," *id.* at 1350, "ConRail had delegated general responsibility for the operation of the

19

intermodal terminal to Penn Trucks" and "ConRail employees did not normally instruct Penn Trucks employees on the details of the work they were doing," *id.* at 1351-52. The plaintiff, an employee of Penn Trucks working at the ConRail terminal, also "received his paycheck from Penn Trucks and took his orders from its employees," and, on the day he was injured, he had been called to work by a dispatcher from Penn Trucks. *Id.* at 1346. Despite ConRail's delegation of control for the operation of the intermodal terminal and the fact that the plaintiff was dispatched and paid by Penn Trucks, we nevertheless upheld a jury verdict against ConRail, largely because the plaintiff was acting under the direction of a ConRail inspector at the time of the accident. *See id.* at 1346-47, 1351-52.

By the same logic, a rational jury could find that Faush was Tuesday Morning's employee. Although he was paid and dispatched by Labor Ready, he worked under the direct supervision and control of Tuesday Morning managers who instructed the Labor Ready employees on the "details of the work they were doing." *See id.* at 1352. Moreover, Labor Ready disclaimed responsibility for supervising the temporary employees' work, and on the rare occasions that a Labor Ready supervisor visited the Tuesday Morning store, she acted as a mere conduit for instructions from the Tuesday Morning manager.

This particular constellation of *Darden* factors is not uncommon—it was also present in *Linstead v. Chesapeake & Ohio Ry. Co.*, 276 U.S. 28 (1928). There, the Big Four Company had an arrangement with the Chesapeake & Ohio Railway Company ("C&O") whereby Big Four lent C&O a locomotive, caboose, and train crew to operate freight trains along a stretch of C&O track in Kentucky and Ohio. This Big

Four crew was provided with C&O's timetables and rulebooks and worked under the supervision of the C&O trainmaster. However, the crew was paid by Big Four and was not subject to discharge by any C&O officer.

Linstead was part of this Big Four train crew when he was killed in a railroad accident. His estate sued C&O under the Federal Employers' Liability Act. Applying common-law principles, the Supreme Court held that Linstead was acting as C&O's servant at the time of the accident. It based its conclusion on the fact that Linstead and his crew were performing work for C&O on C&O tracks and under the "immediate supervision and direction" of a C&O trainmaster. *Id.* at 34. Notably, the Court "d[id] not think that the fact that the Big Four [Rail]road paid the wages of Linstead and his crew, or that they could only be discharged or suspended by the Big Four, prevented their being the servants of [C&O] for the performance of this particular job." *Id.*

*Linstead* underscores the error in granting summary judgment against Faush. Faush worked on Tuesday Morning's premises under the immediate supervision and direction of Tuesday Morning personnel. Tuesday Morning's extensive control over Faush's activities could suffice to make him a common-law servant even though Labor Ready paid him and had the ultimate power to fire him.

We are mindful that many aspects of the Labor Ready-Tuesday Morning employment arrangement that we have identified in combination as sufficient to survive summary judgment will pertain to a large number of temporary employment arrangements, with attendant potential liability under Title VII for the clients of those temporary employment agencies. We do not anticipate, however, that our holding today, which is limited to the Title VII context, will vastly

21

expand such liability, as entities with over fifteen employees are already subject to Title VII. *See* 42 U.S.C. § 2000e(b). In any event, given the broad remedial policies behind Title VII, Congress's decision to use the term "employee" in its common law sense, and the *Darden* factors compel us to conclude that, on the facts here, a reasonable jury could find that Tuesday Morning was Faush's joint employer and that summary judgment was therefore improper.

The decisions of our sister circuits concerning the status of temporary employees confirm this conclusion. In *Maynard v. Kenova Chem. Co.*, 626 F.2d 359 (4th Cir. 1980), the Fourth Circuit held that a temporary worker supplied by a staffing firm to a chemical company was the latter's common-law employee. *Id.* at 360-62.[8] And in *Butler v. Drive Automotive Industries of America, Inc.*, No. 14-1348, 2015 WL 4269615 (4th Cir. July 15, 2015), the same Court held in the Title VII context that both a staffing firm and its client were joint employers of a temporary employee assigned to work for the client. *Id.* at \*9.[9] Notably, in both cases, the

---

[8] *Maynard* predates *Darden*, but it does not predate the common law of agency. Although *Maynard* concerned the West Virginia Workmen's Compensation Act, the Fourth Circuit applied the common law in finding that an employment relationship existed (and, therefore, that certain elements of the Act had been satisfied). *See Maynard*, 626 F.2d at 361-62.

[9] As noted earlier, *Butler* applied a "hybrid" test for employment that purported to be more expansive than the common-law inquiry. The factors it discussed, however, are relevant under the common law as well, and it appears the outcome would have been the same under *Darden*, given that

Fourth Circuit found that an employment relationship existed as a matter of law on summary judgment. Here, we hold only that summary judgment should not have been granted.[10]

We find further support in the applicable guidance from the Equal Employment Opportunity Commission ("EEOC"). According to the EEOC, "[a] client of a temporary employment agency typically qualifies as an employer of the temporary worker during the job assignment [for purposes of Title VII] . . . . because the client usually exercises significant

---

*Darden* was the primary basis for the hybrid test. *See Butler*, 2015 WL 4269615, at *5-9 & nn.11, 13.

[10] The First Circuit's decision in *Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico*, 929 F.2d 814 (1st Cir. 1991), is not to the contrary. There, a ships' agent provided work gangs of stevedores and foremen to the operator of a grain mill for the purpose of unloading cargo vessels. The ships' agent was contractually obligated to supervise the laborers, and the grain mill operator's "supervision of the gangs amounted to merely deciding which materials were to be unloaded first." *Id.* at 821. Under these circumstances, it is unsurprising that the First Circuit held that the grain mill operator was not the laborers' employer. *See id.*

We note, moreover, that the Seventh Circuit expressed doubt that the client of a temporary staffing firm would be able to avoid Title VII liability on the basis that it was not an employer, although it did not decide the question. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 n.5 (7th Cir. 2009).

23

supervisory control over the worker." EEOC Notice 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, Dec. 3, 1997, 1997 WL 33159161, at *5-6. Although "the EEOC's Compliance Manual [and enforcement guidance] is not controlling[,] . . . it may constitute a 'body of experience and informed judgment' to which we may resort for guidance." *Clackamas*, 538 U.S. at 449 n.9 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[11]

In sum, the weight of authority, in conjunction with the evidence presented to the District Court, compels the conclusion that Faush survives summary judgment on his Title VII and Human Relations Act claims.

---

[11] For example, in evaluating whether a shareholder-director was an "employee" for purposes of federal antidiscrimination statutes, the Supreme Court adopted the factors identified by the EEOC, as they were consistent with the "common-law touchstone of control." *Clackamas*, 538 U.S. at 449. The EEOC's guidance concerning temporary employees is persuasive for the same reason—indeed, it mirrors the Supreme Court's analysis of the circumstances under which servants who perform work for the benefit of a master other than their own become that master's servants. *Compare* EEOC Notice 915.002, 1997 WL 33159161, at *5-6, *with Linstead*, 276 U.S. at 33-34 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221-22 (1909)).

**B. Section 1981**

Faush's § 1981 claim, by contrast, was properly dismissed. "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

While it is true that the substantive elements of a § 1981 claim mirror those of a Title VII claim in many respects, *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010), the types of individuals who can bring such claims are not identical. Section 1981 "'does not limit itself, or even refer, to employment contracts.'" *Brown*, 581 F.3d at 181 (quoting *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 14 (1st Cir. 1999)). As a result, "an independent contractor may bring a cause of action under section 1981 for discrimination occurring within the scope of the independent contractor relationship." *Id.*[12]

Faush cannot avoid summary judgment on his § 1981 claim, however, "unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make

---

[12] For this reason, it is incorrect to suggest that a § 1981 claim necessarily "'suffers the same fate'" as a Title VII claim dismissed for lack of an employment relationship. *Faush v. Tuesday Morning, Inc.*, 995 F. Supp. 2d 350, 356 (E.D. Pa. 2014) (quoting *Holtzman v. The World Book Co.*, 174 F. Supp. 2d 251, 258 (E.D. Pa. 2001)).

and enforce.'" *McDonald*, 546 U.S. at 479-80 (quoting 42 U.S.C. § 1981). Faush does not argue that he meets this standard. Moreover, as the District Court recognized, the record does not indicate that Faush entered into a contract with Tuesday Morning or ever attempted to do so.[13] The grant of summary judgment on Faush's § 1981 claim was therefore appropriate.

## III. Conclusion

For the foregoing reasons, we will vacate the District Court's judgment with respect to Faush's Title VII and Pennsylvania Human Relations Act claims and remand for

---

[13] Faush may be a third-party intended beneficiary of certain portions of the Agreement between Labor Ready and Tuesday Morning. The Supreme Court has not ruled out the possibility that such a beneficiary may have rights under § 1981. *See McDonald*, 546 U.S. at 476 n.3. As Faush does not make this argument, however, this is not the appropriate case to explore that possibility.

The fact that temporary employees may not have any remedy for racial discrimination under § 1981—and that any such remedy, if it exists, would be contingent on the terms of a contract negotiated by the staffing firm and its client—demonstrates the perversity of exempting the clients of staffing firms from Title VII. Traditional employees are covered by Title VII, and many independent contractors will be able to avail themselves of § 1981. There is no reason to believe Congress intended for temporary employees to fall through the cracks and be subjected to limitless discrimination at their places of work.

further proceedings. We will affirm the District Court's judgment with respect to Faush's § 1981 claim.