NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 17-1797

———————

ORLANDO A. SMITH,
                                    Appellant
v.

COMHAR, INC.

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-15-cv-04913)
U.S. District Judge:  Honorable Gerald A. McHugh

———————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 15, 2017

Before:  CHAGARES, RESTREPO and FISHER, *Circuit Judges*.

(Opinion Filed:  February 22, 2018)

———————

OPINION*

———————

FISHER, *Circuit Judge*.

Orlando Smith, an employee of COMHAR, Inc., was fired in September 2014. He

sued COMHAR, claiming sex discrimination under Title VII and a related claim under

———————

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

the Pennsylvania Human Relations Act.[1] Following discovery, the District Court granted summary judgment in favor of COMHAR, which we will affirm.

I

COMHAR is a nonprofit organization serving individuals with mental and physical disabilities. In April 2014, Smith was promoted to a supervisory position in which he oversaw six case managers. Smith was hired by and reported directly to Ms. Catina Anastasiadis, who had previously held Smith's new position.

Smith's relationships with two of his subordinates, Ms. Tammy Hairston and Ms. Lori Mina, deteriorated almost immediately. Smith complained of disrespectful and insubordinate conduct, while Hairston and Mina complained of unprofessionalism and a domineering attitude. These strained relationships led to many meetings, mediated by Anastasiadis, in which she supported Smith in his role as supervisor and attempted to help the parties resolve their differences. This pattern repeated itself several times over the ensuing months: a flare up, followed by a meeting with Anastasiadis, and a brief rapprochement.

Smith alleges that, around the time these disputes first arose, Anastasiadis disclosed to him that Hairston and Mina disagreed with her decision to promote Smith in the first place. According to Smith, Anastasiadis told him that she would keep the case managers informed during the hiring process, and that "the only people that had any

[1] 42 U.S.C. § 2000e *et seq.*; 43 PA. CONS. STAT. § 951 *et seq.*

problem [with potential candidates] were [Hairston and Mina] and it seemed to be about the men."[2]

Smith eventually drafted two disciplinary memos directed to Hairston and Mina, but Anastasiadis and an assistant Human Resources director recommended that Smith not issue the memos given how short a time he had been in the supervisor position. In response, Smith went directly to Anastasiadis' boss for support. This prompted a meeting between Smith and Anastasiadis, during which Anastasiadis claims he behaved in a condescending, disrespectful, and aggressive manner towards her, though Smith denies this characterization of his conduct. That evening, Smith sent an email directly to the Director of Human Resources, Barry McLaughlin, expressing his concern that he was being discriminated against based on his gender because everybody who was critical of his treatment of Hairston and Mina were women. McLaughlin, a man, offered to meet with Smith to address his concerns, but Smith declined. About two weeks later, Smith and Mina had a highly contentious meeting, with Mina storming out of Smith's office and yelling, "I'm going to get that bastard fired, I promise I'm going to get him fired."[3]

The next day, Thursday, Mina sent an email to the case management team (including Smith) in anticipation of her two-day vacation the following week. In this email, Mina provided an update on several of her more challenging clients, including KM, whom Mina identified as being particularly high-risk due to a recent relapse. Mina

---

[2] App. 51.
[3] App. 96.

expressed her concern that KM could overdose or get into legal trouble in the near future, and also noted that she would be meeting with KM the following day.

The next morning, KM arrived at COMHAR to receive her entitlement money. For some clients, government benefits are paid to COMHAR on behalf of the client, with COMHAR then disbursing the funds in installments. Mina had not yet arrived at the office, so a clerical worker contacted Smith to ask if he would provide KM with her allotted payment. Smith complied without contacting Mina. When Mina arrived shortly thereafter, she was dismayed at Smith's decision and his lack of communication. Mina then left to search for KM. The next day, Mina sent Anastasiadis an email detailing Smith's actions and describing the incident as "another prime example of no communication."[4] Anastasiadis forwarded this email to her supervisor, who made the decision to suspend Smith. The next week, Smith met with Anastasiadis and other directors to discuss the KM incident. During this meeting, Smith took the position that he had done nothing wrong and blamed both Mina and the clerical worker.

During Smith's suspension, Anastasiadis assumed his job responsibilities. Anastasiadis discovered several additional examples of Smith's mismanagement, such as his lack of regular meetings with his team and his failure to follow through on administrative tasks Anastasiadis had assigned him. Anastasiadis sent a memo to her supervisors cataloguing all of her concerns with Smith and concluding that he was "not

---

[4] App. 209.

4

appropriate for [the supervisor position] . . . [and] present[ed] a risk" to COMHAR's clients.[5] About one month after the KM incident, COMHAR fired Smith, citing Smith's lack of supervision, poor communication, poor clinical judgment, and inability to resolve persistent conflicts with his subordinates.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We exercise jurisdiction under 28 U.S.C. § 1291. On an appeal from a grant of summary judgment, our review is plenary.[6] Summary judgment is appropriate when there are no genuine disputes as to material facts and the moving party is entitled to judgment as a matter of law. We will view the evidence in the light most favorable to the nonmovant, but "[t]he mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue."[7] Smith's claims under Title VII and the Pennsylvania Human Relations Act will be analyzed jointly.[8]

## III

---

[5] App. 218.

[6] *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009).

[7] *Id.*

[8] *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213 (3d Cir. 2015) (claims under these laws are generally "interpreted coextensively").

5

As first articulated in *McDonnell Douglas Corp. v. Green*, a Title VII complainant carries the initial burden of establishing a prima facie case of discrimination.[9] The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's" termination.[10] A complainant will survive summary judgment if he can show that the proffered reason was a pretext.[11] This he may do by presenting evidence that would allow a reasonable factfinder to either "conclude that each reason was a fabrication[,]" or, alternatively, "infer that discrimination was more likely than not a motivating . . . cause" of the firing.[12]

Assuming that Smith presented a prima facie case, COMHAR easily meets its burden of proffering legitimate, nondiscriminatory grounds for Smith's termination: his inability to communicate with his subordinates, poor clinical judgment, and abrasive conduct. Smith attempts both available avenues of attack on COMHAR's proffered reasons, painting COMHAR's rationale as a weak and implausible fabrication, and also arguing that discriminatory animus was the true cause of his termination. For the reasons explained below, Smith's arguments fail.

*A. Smith has not shown that COMHAR's justifications were fabricated.*

---

[9] 411 U.S. 792, 802 (1973).
[10] *Id.*
[11] *Id.* at 804–05.
[12] *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)) (internal quotation marks omitted).

Smith focuses the lion's share of his argument on the chain of events surrounding Mina's missing client, KM. Smith contends that the entire incident was overblown, disputes the length of time that KM was unaccounted for, and places all blame on Mina and other COMHAR employees. Smith's singular focus on the missing client fails in its own right, but also neglects the additional, valid reasons COMHAR proffered.

To start, there is ample evidence in the record that Smith demonstrated poor clinical judgment in disbursing funds to KM. More importantly, the fact that this mistake could be traced back to poor communication within the case management team, the maintenance of which was Smith's responsibility, provided all the more reason for COMHAR to factor this incident into its termination decision. How long KM was missing for, whether she used the allotted funds to purchase drugs, and whether Mina should have been more clear in her warning email about KM are ultimately beside the point. COMHAR was justified in holding Smith accountable for the overall failure of his team. Notably, Smith's burden is not simply to show that COMHAR was wrong, "but that it was so plainly wrong that [its reasons] cannot have been" the true motivation for the firing.[13] Smith has failed to do so with regard to the KM incident, much less with regard to the complete justification proffered by COMHAR.

*B. Smith has not shown that discrimination was more likely than not the motivating factor in his termination.*

---

[13] *Id.* (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)) (internal quotation marks omitted).

Smith also pursues the alternative approach of demonstrating that gender discrimination was more likely than not the motivating factor in his firing. Smith's sole piece of affirmative evidence even plausibly suggestive of gender discrimination is the comment, allegedly made by Anastasiadis in reference to Mina and Hairston, that the latter two "had objections" to certain candidates for the supervisor role eventually given to Smith, "and it seemed to be about the men." Even assuming that Anastasiadis made this statement, and that her impression of Mina and Hairston's feelings was accurate, both Mina and Hairston worked under Smith and had no apparent ability to affect his employment status, whatever their prejudices.

To circumvent this obstacle, Smith posits the "cat's paw" theory of liability, whereby an employer may still be liable for discrimination even if the discriminatory motivation comes from somebody other than the ultimate decision-maker. According to Smith, Mina, motivated by gender bias, orchestrated the entire KM episode in order to get Smith fired, and COMHAR's upper-level management culpably abetted her discriminatory plot. Plausibility aside, the basic infirmity with Smith's theory is that, since the "injection" of "cat's paw" liability into discrimination law, the underlying assumption has always been that the animus-harboring individual is at least senior to the

victim.[14] Likewise, when we have addressed questions arising out of "cat's paw" claims, we have operated under the same assumption.[15] Ultimately, we need not decide whether a subordinate's bias could theoretically lead to liability for an employer, because even assuming this to be the case, Smith's claim fails.

The Supreme Court has clarified that in "cat's paw" cases the relevant question is whether a bias-motivated action was the proximate cause of the ultimate employment action.[16] That would be plausible here only if: (1) Mina actually harbored a discriminatory animus, (2) it was this animus, not reasoned judgment, that led her to take the eminently practical step of reporting her concerns about Smith's disbursement of funds to KM, and (3) relevant decision-makers at COMHAR based their firing decision on Mina's report, and not an independent assessment of the KM situation and Smith's overall record of performance as supervisor. The record arguably presents a genuine issue of material fact as to the first premise, but not the second or third. In short, no reasonable

---

[14] *Staub v. Proctor*, 131 S. Ct. 1186, 1190 n.1 (2011) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)). While the doctrine is sometimes given the potentially misleading title of "subordinate bias," in such usage "subordinate" refers to the biased party being subordinate to the ultimate decision-maker, not subordinate to the injured party. *See EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 487–88 (10th Cir. 2006).

[15] *See Jones v. SEPTA*, 796 F.3d 323, 330–31 (3d Cir. 2015) (discussing whether the "supervisor's biased report" was the proximate cause of the employment action); *McKenna v. City of Philadelphia*, 649 F.3d 171, 177–78 (3d Cir. 2011) (assessing relative weight given to supervisors' opinions before rendering termination decision).

[16] *Staub*, 131 S. Ct. at 1194.

"factfinder could conclude by a preponderance of the evidence that [discrimination] was a motivating or determinative factor in [COMHAR's] employment decision."[17]

Smith has failed to rebut COMHAR's proffered justifications for his firing, so the District Court's grant of summary judgment was appropriate.[18]

IV

The Order of the District Court is AFFIRMED.

---

[17] *Simpson v. Kay Jewelers*, 142 F.3d 639, 644–45 (3d Cir. 1998).

[18] In the District Court, Smith also raised a retaliation claim under Title VII. Smith's passing reference to this claim in the final paragraph of his initial brief is insufficient to sustain the issue, and it is accordingly waived.